Unified Judicial System

 

 
 Sherry K. Smith, as Personal Representative of Mary K. Ross and as guardian of Kristian K. Ross
Plaintiff and Appellant v.
Lagow Construction & Development Company and Lloyd Property Management Company
Defendants and Appellees. [2002 SD 37]
South Dakota Supreme Court
Appeal from the Circuit Court of The Second Judicial Circuit
Minnehaha County, South Dakota
Hon. Glen A. Severson, Judge
Robert L. Morris of Day, Morris & Schreiber Belle Fourche, South Dakota
John W. Burke of
Barker, Wilson, Reynolds & Burke
Belle Fourche, South Dakota
Attorneys for plaintiff and appellant.
 
Richard J. Helsper Victoria M. Duehr of Glover, Helsper & Rasmussen Brookings, South Dakota
Attorneys for defendant and appellee.
 
Argued January 10, 2001
Reassigned 11/9/2001
Reassigned 11/9/2001
Opinion Filed 3/13/2002
#21530
KONENKAMP, Justice (on reassignment).
[Â¶1.] A tenant was murdered when hired killers used a key to enter her apartment.  Shortly before her death, she told two apartment employees that one of her keys was missing.  According to her mother, the tenant also asked to have her lock changed.  Landlord policy prohibited tenants from changing their own locks and required a fee to change them.  When the tenant's estate sued, the circuit court granted summary judgment, ruling that under these facts landlords owe no duty of protection to their tenants.  We reverse because there are genuine issues of material fact, and although a landlord owes no general duty to tenants to protect them from crime, such a duty arises when a landlord's affirmative acts or omissions create a foreseeably high risk to the tenant.  
Background
[Â¶2.] Defendants Lagow Construction and Developing Company and Lloyd Property Management Company own and manage, respectively, the Westport Apartment complex in Sioux Falls, South Dakota.  Westport is a low-income development.  In 1994, Mary K. Ross rented an apartment at Westport for herself and her daughter.  She received a copy of the apartment policies, detailing procedures for maintenance and repairs.  One policy provision stated, "lock changes or additional locks are not permitted, it being understood that owner or manager may be required to enter in an emergency when no resident is present, such as fire or water coming through the ceiling."  Tenants were required to pay a $45 fee to replace a lost key.  This fee covered the cost of changing the lock, if a lock change was necessary.  If a tenant could not afford the fee at the time the key was lost, the cost would be deducted from the tenantâs security deposit.  A tenant could inform the manager by phone, in writing, or in person, that a key was lost and a lock change was needed.
[Â¶3.] When Ross's friend, Amy Power, experienced marital difficulties, Ross allowed Amy to live in the apartment.  She gave Amy a key.  From the limited facts in the record, it appears that in July 1995, Amy lost her key ring, which included the key to Ross's apartment.  Ross informed the maintenance person, Watson Lewing, who in turn told his manager, Jodi Bentz, that one of the keys to her apartment was missing.  The parties dispute whether Ross requested a lock change, however.
[Â¶4.] Lewing testified by deposition that he did not remember whether Ross requested a lock change.  Bentz testified in her deposition that when Lewing informed her of Ross's missing key, she asked Lewing whether Ross wanted the lock changed, and he told her that Ross declined because Ross believed the keys would "turn up."  The next day Bentz personally spoke with Ross and asked her whether she wanted the lock changed.  Ross declined.  Employees, Lewing and Monica Price, neither of whom now work for defendants, and Bentz, who still does, all testified consistently about the key loss and Ross's decision not to request a lock change.
[Â¶5.] On the other hand, the Ross estate offered the affidavit of Sherry Smith, Ross's mother.  Her affidavit states that (1) she maintained frequent phone contact with Ross; (2) she spoke with Ross three days before the murder and Ross told her that she had requested a lock change; (3) Ross told her she needed money to pay for a lock change; and (4) she detected fear in Ross's voice, and Ross refused to discuss the Robert and Amy Power situation, telling her mother, "I do not want to talk about him; he's psycho."
[Â¶6.] In May 1995, before the key was lost, discord intensified between Amy and her husband, Robert Power.  He decided that Ross was partially responsible for the difficulties in his marriage.  That led him to contact Michael Smith.  Together, they developed a plan for murder.  See State v. Smith, 1998 SD 6, 573 NW2d 515.  They hired two other individuals to commit the crime.  Power gave Smith the apartment key, and he in turn gave it to the hired killers.  On July 9, 1995, the two men entered Ross's apartment with the key and stabbed her to death.  Robert Power was apprehended, and he pleaded guilty to first-degree murder.  He was sentenced to life without parole in the state penitentiary.  
[Â¶7.] It is unclear from the record how Robert Power obtained a key to the apartment.  He may have made a copy for himself in February 1995, when Ross gave it to him to make a copy for her to give to her babysitter.  He may have had access to the key in June 1995, when he and his wife left Ross's apartment and Amy thought she had lost her keys in the parking lot.
[Â¶8.] The Ross estate brought suit alleging negligent maintenance of the apartment complex.  Defendants moved for summary judgment, asserting that they owed no common law duty to Ross because no special relationship existed.  The circuit court granted summary judgment for defendants.  The Ross estate appeals on the following issues:  (1) "Whether defendant landlords' exclusive control over the lock on Ross's apartment door created a special relationship between Ross and defendant landlords."  (2) "Whether defendant landlords owed Ross a duty of due care because it was reasonably foreseeable that she would be harmed."
Analysis and Decision
[Â¶9.] This case presents two questions, one factual, the other legal.  First, did Ross request a lock change?  And if so, second, what legal duty did defendants have in response to that request?  On question one, bearing in mind that a material fact is one that might affect the outcome of the case, we conclude that a genuine material fact exists here.  See Anderson v. Liberty Lobby, Inc., 477 US 242, 248, 106 SCt 2505, 2510, 91 LEd2d 202, 211-12 (1986).  Defendants' employees testified that Ross told them of the missing key, but that she declined to have her lock changed.  Ross's mother, on the other hand, avers under oath that Ross said she did request a lock change.  On the second question, we must define what legal duty exists under the particular facts of this case.
[Â¶10.] In some jurisdictions, the law has gradually moved toward expanding landlord liability in instances where violent criminal acts by third parties are foreseeable and preventable.  W. Page Keeton et al., Prosser and Keeton on the Law of Torts Â§ 63 at 442-43 (5th ed 1984).  Little in South Dakota law, however, suggests that landlords have a general duty to protect tenants from all criminal activity.  Crime is everywhere, and proprietors ought not to bear the wholesale responsibility of protection simply because their tenants, like other members of society, become crime victims.  Not even government law enforcement carries the burden of civil responsibility to victims if it fails to thwart criminal behavior.  Gleason v. Peters, 1997 SD 102, 568 NW2d 482.
[Â¶11.] Most courts refuse to impose a broad duty on landlords to protect tenants from criminal acts committed by third parties on the premises.  See Rowe v. Lombard, 531 NE2d 1358, 1364 (Ill 1988) (citing cases).  As the West Virginia Supreme Court acknowledged, the notion of expanding the duty of landlords to secure people against crime tends to reach the absurd:  âOne can foresee landowners, proprietors of restaurants, stores, theaters, banks, schools, and, indeed, public buildings being civilly responsible for all crimes on their premises.â  Miller v. Whitworth, 455 SE2d 821, 826-27 (WVa 1995) (quoting Clarke v. J.R.D. Management Corp., 461 NYS2d 168, 170 (NYCityCivCt 1983)).
[Â¶12.] On the whole, we recognize no general duty to protect one's fellow human beings from crime, and that rule equally applies to the ordinary relationship of landlord and tenant.  If a duty exists for such protection, it must originate from some special relationship imposing an obligation to protect another from crime based on a position of dependence intrinsic to the relationship.  A special relationship can occur between common carriers and passengers, innkeepers and guests, business owners and invitees, and employers and employees.  See Restatement (Second) of Torts Â§ 314A (1965).
[Â¶13.] In granting summary judgment for defendants, the circuit court applied our special relationship test from Walther v. KPKA Meadowlands Ltd. Partnership, 1998 SD 78, Â¶41, 581 NW2d 527, 535.  There, we confirmed that a landlord-tenant arrangement creates no special relationship, and, although landlords have a duty to maintain the safe physical condition of the common areas within their exclusive control, the tenant's window in that case was not under the exclusive control of the landlord.  Id. at Â¶42, 49.  Here, because defendants did not have exclusive control over Ross's apartment lock, the circuit court held that defendants had no special relationship with Ross.  We agree with this reasoning as far as it went.  Ross herself gave Robert Powers access to her apartment key five months before he contracted to have her murdered.  As defendants did not have exclusive control over her apartment lock, no special relationship existed here.
[Â¶14.] On the other hand, the special relationship test is not the only rule applicable in this case.  There are compelling reasons to depart from the restrictive common law conception of landlord liability for leasehold injuries.  For many, especially the poor, a rental property may be the only home they will ever occupy.  A home is a citadel, and its integrity depends, at least in part, on its locks.  A locked door is the first defense to a violent world.  Landlords who insist on control over decisions on changing tenant locks may bear some limited responsibility to their tenants when locks need to be changed or repaired in the face of foreseeable imminent danger.  We conclude that although no special relationship was created in this circumstance, the policy controlling the changing of tenant locks placed defendants in a position of heightened responsibility to their tenants.
[Â¶15.] Mary K. Ross died when her killers used a key to her apartment.  If her lock had been changed beforehand, perhaps she would not have died.  Only defendants' employees could have changed her lock.  See Cain v. Vontz, 703 F2d 1279, 1283 (11thCir 1983) (imposing liability for broken or nonexistent apartment door locks).  There is no question that Ross told defendants' representatives that one of her keys was missing.  But, as we have said, there remains a question of fact:  did she ask to have her lock changed?  We are obliged to view the facts in a light most favorable to the nonmoving party.  Pickering v. Pickering, 434 NW2d 758, 760-61 (SD 1989).  If she asked, as we must assume she did for the purposes of summary judgment, the controlling question then becomes whether defendants may be liable for negligence in failing to act.
[Â¶16.] A duty of protection occurs when a person's affirmative act or omission exposes another to greater harm.  Section 302B of Restatement (Second) of Torts (1965) creates an exception to the general rule that one has no duty to protect another from crime.[1]   It provides that such a duty may arise if a person's affirmative acts or omissions create a foreseeable high risk of harm from criminal assault.  Thus, landlords who by their own affirmative acts or omissions create a high risk of harm from crime owe a duty to exercise reasonable care to protect tenants from that increased risk.  However, it is not enough for liability purposes that landlords prohibit tenants from changing door locks and demand a fee for changing them.  Landlord responsibility also depends on the foreseeability of a criminal act.
[Â¶17.] Foreseeability of high risk of harm is the basis for delineating the boundaries for a duty of protection.  B. A. Glesner, Landlords As Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises, 42 CaseWResLRev 679 passim (1992).  Whether a duty exists is a question of law to be answered by the court.  Tipton v. Town of Tabor, 1997 SD 96, Â¶11, 567 NW2d 351, 357.  "'A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'"  Id. at Â¶12 (quoting Keeton et al., supra, Â§ 53 at 356).
[Â¶18.] Although foreseeability is a question of fact in some contexts, foreseeability in defining the boundaries of a duty is always a question of law.  Poelstra v. Basin Electric Power Cooperative, 545 NW2d 823, 825-26 (SD 1996); Mark, Inc. v. Maguire Ins. Agency, Inc., 518 NW2d 227, 229-30 (SD 1994) (citations omitted).  Foreseeability in the "duty" sense is different from foreseeability in fact issues bearing on negligence (breach of duty) and causation.
[Â¶19.] In this summary judgment appeal, we cannot decide the question of duty because the record is incomplete, and we must view what limited facts we have in a light most favorable to the nonmoving party.  Most courts fix the limits of foreseeability by examining all the circumstances, including the landlordâs knowledge of prior criminal incidents on the premises.  The prior incidents must be sufficiently numerous or of such significance and similarity that the landlord was on notice that there was probable danger to the tenants.  Faheen v. City Parking Corp., 734 SW2d 270, 273-74 (MoCtApp 1987).  But see Gulf Reston, Inc. v. Rogers, 207 SE2d 841 (Va 1974) (thrown object from upper apartment inducing heart attack not foreseeable).  If Ross did request a lock change, then the circuit court must decide whether there is sufficient evidence to raise the following factual question:  could defendants have reasonably foreseen that their failure to change Rossâs lock probably put her at an unreasonable risk of harm from crime?  See Glesner at 703.  To borrow Cardozoâs words written in another context, "[t]here must be knowledge of a danger, not merely possible, but probable."  MacPherson v. Buick Motor Co., 111 NE 1050, 1053 (NY 1916).  Defendants must have had notice of the probable increased risk of crime and the condition that increased that risk.
[Â¶20.] In a majority of cases where a landlord was held liable for a criminal attack on a tenant, a known physical defect on the premises foreseeably increased the risk of that attack.  See, e.g., Aaron v. Havens, 758 SW2d 446, 448 (Mo 1988) (inadequately secured fire escape); Braitman v. Overlook Terrace Corp., 346 A2d 76, 77 (NJ 1975) (defective deadbolt on apartment door); Duncavage v. Allen, 497 NE2d 433, 437 (IllAppCt 1986) (inoperable lighting; ladder left unattended near unlocked window).  If landlords insist on the exclusive right to change locks, then they should have some duty to change those locks when they are no longer effective against foreseeable criminal activity.
[Â¶21.] In sum, we reverse the summary judgment in this case and remand for further proceedings.  A fact finder must decide whether Ross requested that her lock be changed.  If she did not, then that would end the matter, because she was not obliged to change her lock, and defendants had no affirmative duty to protect her.  If she did request a lock change, then the court must decide whether, based on all the circumstances, there was sufficient evidence to make it reasonably foreseeable that defendants' failure to act on her request put her at probable high risk of harm from an imminent criminal act.  If it was not reasonably foreseeable, then no duty existed.  If the court rules that it was reasonably foreseeable, then the fact finder must decide whether defendants were negligent in failing to act on her request and whether such negligence was the proximate cause of her death.
[Â¶22.] Reversed and remanded with instructions.
] AMUNDSON, Justice, concurs.
[Â¶23.] SABERS, Justice, concurs in result.
[Â¶24.] GILBERTSON, Chief Justice and MILLER, Retired Chief Justice, dissent.
 
SABERS, Justice (concurring in result).
[Â¶25.] I concur in the result, but not in the theory of the majority opinion.  The theory espoused by the majority opinion violates Plaintiffâs right to a jury trial.  It allows the court, rather than the jury, to determine whether a failure to change the lock, if the jury determines a change was requested, resulted in foreseeability that someone might enter and harm the decedent.  The question of foreseeability is a question of fact for the jury.  I would rephrase the issue as:  whether genuine issues of material fact exist concerning landlordâs duty to Ross, if any, to change the lock.  Since genuine issues of material fact exist, we should reverse and remand for a jury trial.
[Â¶26.] The trial court erred in applying the special relationship two-part test articulated in Walther, 1998 SD 78 at Â¶41, 581 NW2d at 535.  This test is only applicable when the plaintiff asserts the defendant had a duty to control the conduct of another with dangerous propensities.  E.P. v. Riley, 1999 SD 163, Â¶31, 604 NW2d 7, 15-16.  Walther involved a man crawling through a properly working window left open by the victim.  1998 SD 78 at Â¶6, 581 NW2d at 530.  The subsequent claim that the landlord had a duty to protect is clearly distinguishable from the case at hand.  Accordingly, this case should be analyzed using ordinary negligence principles rather than the special relationship framework.   
[Â¶27.] Under ordinary negligence principles, Smith is required to prove that:  (1) there was a duty; (2) there was a failure to perform that duty; and (3) an injury resulted from such failure.  Leslie v. City of Bonesteel, 303 NW2d 117, 119 (SD 1981).  â[W]hether the defendant owed a duty to the plaintiff and whether the defendantâs conduct proximately caused the plaintiffâs injury are, in effect, so interrelated that they are generally treated as one [and] the same.â  Id. (citing Goff v. Wang, 296 NW2d 729, 730 (SD 1980)).  In order to sustain the cause of action, Smith was required to demonstrate that âthe harm suffered [was] a foreseeable consequence of the act complained ofâ and â[t]he negligent act [was] a substantial factor in bringing about the harm.â  Id. (citing Williams v. United States, 450 FSupp 1040, 1046 (DSD 1978)).  
[Â¶28.] Nothing in South Dakota law suggests that landlords have an affirmative duty to protect tenants from criminal activity.  In some jurisdictions, however, the law has gradually moved toward enlarging landlord liability in instances where violent criminal acts by third parties are foreseeable and preventable.  W. Page Keeton et al., Prosser and Keeton on the Law of Torts Â§ 63 at 442-43 (5th ed 1984). 
[Â¶29.] Many courts pondering whether landlords are under a duty to protect their tenants against criminal activities by third persons have held that no duty exists simply by reason of the relationship, but that a duty might arise under special circumstances.  Landlordâs Obligation to Protect Tenant Against Criminal Activities of Third Persons, 43 ALR3d 331 Â§ 2(a) at 335.  Landlords who by their own negligent acts or omissions increase the risk of harm from crime owe a duty to exercise reasonable care to protect tenants from that increased risk.  See Restatement (Second) of Torts Â§ 302B (1965) (an exception to the general rule that one person has no duty to protect another from crime exists where that personâs affirmative acts or omissions have created a foreseeable high risk of harm from intentional misconduct).  See also Restatement (Second) of Torts Â§ 448 (1965) (criminal act of third person is superseding cause of harm to another unless defendants could have foreseen that their negligent conduct increased risk of crime).  Foreseeability of harm then becomes the basis for delineating the boundaries for a duty of protection.  B.A. Glesner, Landlords As Cops: Tort, Nuisance & Forfeiture Standards Imposing Liability on Landlords for Crime on the Premises, 42 CaseWResLRev 679, 685 (1992).
[Â¶30.] It has been a well established principle, to date at least, that when a landlord reserves control over a portion of the premises, a failure to carefully maintain that area creates tort liability.  Boe v. Healy, 84 SD 155, 159-60, 168 NW2d 710, 712-13 (1969).  Landlords who prohibit their tenants from changing door locks and who demand a fee before changing locks when requested to do so, even in the face of increased danger to tenants, may become liable for negligence as a result of the increased risk to the tenant.  If landlords insist on the exclusive right to change locks, then they may have some duty to change them when the locks are no longer effective against foreseeable criminal activity.  See Cain, 703 F2d at 1283 (imposing liability for broken or nonexistent apartment door locks).  
 [Â¶31.] Under this record, we must view the facts in a light most favorable to the nonmoving party.  Wilson v. Great N. Ry. Co., 83 SD 207, 212, 157 NW2d 19, 21 (1968).  The facts viewed in the light most favorable to the nonmovant establish that:
1.      The landlord exercised exclusive control over the changing of the lock.
 
2.      The landlord was informed that a key had been missing.
 
3.      The decedentâs only remedy was to request that the landlord change the lock.
 
4.      The decedent told her mother that she had requested a lock change.
 
5.      The decedent requested to borrow money to pay for the lock change.
 
6.      The lock was not changed.
 
[Â¶32.] Assuming these facts as true, as required in summary judgment, there is a genuine issue of material fact and a jury question whether the request was made to change the lock.  It is for a jury to determine if the failure to change the lock, if it finds the change was requested, resulted in foreseeability that someone might enter and harm the decedent.  The question of foreseeability is a question of fact for the jury.  E.P., 1999 SD 163 at Â¶33, 604 NW2d at 16.  This question of foreseeability can and should be determined under SDCL 20-9-1, which provides:  âEvery person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill, subject in the latter cases to the defense of contributory negligence.â
[Â¶33.] We should reverse and remand so the jury can determine genuine issues of material fact, proximate cause and foreseeability under proper instructions.
 
GILBERTSON, Chief Justice (dissenting).
[Â¶34.] I respectfully dissent.
[Â¶35.] Clearly, the general rule is that there is no duty to protect a person from the criminal acts of a third party.  Our two-pronged test, expressed a mere three years ago in Walther, states that a duty to protect a person from the criminal acts of a third party can arise ONLY if:  (1) a special relationship exists between the landowner and the injured party; and (2) the intentional criminal acts were foreseeable.  Walther, 1998 SD 78 at Â¶41, 581 NW2d at 535.  Thus, both must be established or a plaintiffâs claim fails.  In Walther, we held that no special relationship existed between a landlord and a tenant.  Id. at Â¶42.  Herein, neither is established and thus, the conclusion of this Court to hold to the contrary is in error.  
[Â¶36.] 1.       No special relationship existed.
[Â¶37.] A legal obligation generally must come from one of three sources.  First it can be created by enactment of a specific statute.  SDCL 1-1-23.  No statute creating a duty of due care between a landlord and tenant exists in this state.  Second, the obligation can come from the common law.  Id.  We held in Walther, no such common law duty exists between a landlord and tenant.[2]   Finally an obligation can arise from a contract.  It is the contractual lease between landlord and tenant 
concerning lost key and lock replacement upon which this Court focuses to arrive at its âspecial circumstances.â  Yet â[w]e have long recognized that âconduct that is merely a breach of contract is not a tort.ââ  Trouten v. Heritage Mut. Ins. Co., 2001 SD 106, Â¶32, 632 NW2d 856, 865 (quoting Weeg v. Iowa Mut. Ins. Co., 82 SD 104, 109-110, 141 NW2d 913, 916 (1966) (additional citation omitted)).    
[Â¶38.] 2.  Forseeability.
[Â¶39.]             Moreover, the Courtâs analysis of forseeability is in error.  The landlord-tenant relationship is not analogous to other relationships where a duty has been imposed.  See Walther, 1998 SD 78 at Â¶44, 581 NW2d at 536.  In Walther we distinguished the landlord-tenant relationship from the business invitee-landowner relationship.  Id. (citations omitted).  In distinguishing the two relationships we stated that âthe landlord cannot be expected to protect [tenants] from the wiles of felonry any more than the society can always protect them upon the common streets and highways leading to their residence or indeed in their home itself.â  Id.  (citations omitted).  We further noted that:
[a]n apartment building is not a place of public resort where one who profits from the very public it invites must bear what losses that public may create.  It is of its nature private and only for those specifically invited.  The criminal can be expected anywhere, any time, and has been a risk of life for a long time.
 
Id.  (citations omitted).
 
[Â¶40.]             This Court bases its decision on the issues of exclusive control and foreseeability.  But Ross gave Robert Powers, who contracted for her murder, access to her apartment key five months before her death.  Not only did Ross share control of the locks with Lagow, she voluntarily extended control to Amy Powers, as well.  Ross made no allegation that Lagow had any notice of the problems between Robert and Amy Powers, or even that Amy Powers was a resident in Rossâs apartment.  Amy Powers lost the key to Rossâs apartment unbeknownst to Lagow.  Lagow certainly did not have exclusive control of the lock.  Nor could Lagow foresee any problem when it was not even aware that an additional key had been given to a third person not party to the lease contract.  See King v. Ilikai Properties, Inc., 632 P2d 657 (HI 1981) (holding where tenant does not give explicit notice of particular threat, placing liability on landowner is unjustly imposing a duty of impossible performance); Advance Rental Centers, Inc. v. Brown, 729 SW2d 644 (MoAppCt 1987) (holding while âspecial relationshipâ or âspecial circumstancesâ may give rise to landlord-tenant duty, no such relationship or circumstances existed where landlordâs contractor exposed tenantâs premises to theft); Martin v. Usher, 371 NE2d 69 (IllAppCt  1977) (holding landlordâs failure to maintain locks, windows, and lights did not give rise to âspecial relationshipâ or duty); Knapp v. Wilson, 535 SW2d 369 (TexCivApp 1976) (holding key lost by former tenant amounted only to mere possibility of burglary, not foreseeable risk).  The facts of this case do not justify placing a special duty upon Lagow to protect its tenants from the criminal acts of third parties.[3] 
[Â¶41.] 3.       Issue of foreseeability not appropriate for appellate review.
 
[Â¶42.] Normally the next step would be to determine if Ross showed sufficient facts to create a jury question on foreseeability by applying the totality of the circumstances test.  Walther, 1998 SD 78 at Â¶41, 581 NW2d at 535 (citing Small v. McKennan Hosp., 403 NW2d 410, 413 (SD 1987)).  In this case, however, the trial court did not address this issue, therefore the issue is not appropriate for appellate review.  Thompson v. Summers, 1997 SD 103, Â¶24, 567 NW2d 387, 395 (citations omitted).
                                                        Conclusion
[Â¶43.] Today the Court disregards the distinction between tort and contractual duties and the two-pronged test articulated in Walther, which establishes when a duty between a landlord and tenant arises.  Instead, the Court erroneously applies other principles of negligence to establish a duty between a landlord and tenant arising under âspecial circumstances.â  Under its flawed reasoning, the legal rationale of this case as compared with Walther is that the landlord apparently has a duty to protect tenants from felonious criminals who enter through a tenantâs door, but not through a tenantâs window.
[Â¶44.] Perhaps there would be no difference in the ultimate amount of landlord liability in this case, whether based on tort or breach of contract if both were properly pled.  That is unknown, however, because the contract issue has not been brought before this Court on this appeal and therefore, cannot be considered.  What about the next missing-key case where there is no clause or even a written lease on the subject?  Does landlord liability still attach via tort principles as this Court holds today?  If so, the âspecial circumstances exceptionâ has just swallowed up the general rule of landlord tort non-liability with no legal basis to do so.
[Â¶45.] For the above reasons, I respectfully dissent.
[Â¶46.] MILLER, Retired Chief Justice, joins this dissent.

[1].        Restatement (Second) of Torts Â§ 302B cmt e (1965), provides, in part, that situations in which an actor is required to guard against criminal misconduct of others
arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.
Restatement (Second) of Torts Â§ 448 (1965) provides:  
The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

[2].         The Court concedes this point when it declares, â[l]ittle in South Dakota statutes and precedents, however, suggests that landlords have a general duty to protect tenants from all criminal activity . . . .  Most courts refuse to impose a broad duty on landlords to protect tenants from criminal acts committed by third parties on the premises.â
 

[3].         This is not to say that a special relationship between a landlord and tenant can never exist, only that one does not arise in this case.  See, e.g., Flood v. Wis. Real Estate Inv. Trust, 503 FSupp 1157 (DCKan 1980) (holding landlord liable where he failed to maintain security as bargained for at beginning of the lease); Doe v. Stegall, 757 So2d 201 (Miss 2000) (finding genuine issue of material fact where manager gave third party a master key); Rowe, 531 NE2d 1358 (finding genuine issue of material fact where manager knew master key and grand master key were missing); Razdan v. Parzen, 278 SE2d 687 (GaCtApp 1981) (holding landlord liable for theft of tenantâs property when landlord gave key to bogus repairman).  Furthermore, these types of relationships are generally imposed by contract, thus giving rise to a breach of contract action.  At most, Ross may be able to show that Lagow violated the provision in the lease that requires it to change a tenantâs lock upon request and receipt of the $45 fee.  But a breach of contract action does not automatically give rise to a âspecial relationshipâ that may then become a basis for a tort claim.  Trouten, 2000 SD 106 at Â¶32, 632 NW2d at 864.